We're happy to hear argument in our first case, Mr. Thomas. Whenever you're ready. Thank you, Your Honor. May it please the Court, my name is David Thomas. Good to see the panel again. I represent Ethicon on this matter. I have three points I'd like to make with the Court today. First, that the plaintiff's failure to warn claims fails a matter of law because the prescribing doctor testified she would prescribe this TBTO again. She testified it was the best product she had to treat this woman's stress urinary incontinence. Second, the District Court rejected controlling law in Illinois on COMET-K by refusing to apply COMET-K and allowing the jury to substitute its judgment on the risk-utility analysis rather than the doctor and the FDA, who under COMET-K is in the best position to identify the risks and benefits of this product for this plaintiff. And three, that the District Court erred in excluding all of the regulatory history for the TBTO going all the way back to the 60s. But most specifically, the District Court erred in excluding the 2011 and 2013 pronouncements by the FDA that specifically convened an advisory panel and evaluated the safety and efficacy of these products. And the District Court excluded those under the Court's analysis in CISN. Your Honor, the Honors, under the failure to warn claim, Dr. Burkett, who is a treating physician in this case, testified unequivocally that if a patient like Ms. Husky presented at her office tomorrow, she would use the TBTO again because it was the best thing that she could offer Ms. Husky for her stress urinary. I think you may be overstating that her testimony was unequivocal. I mean, she was all over the place, it seems to me. She said that. I can see that. But later on at some point, she also said that if she'd known about this particular patient's active lifestyle, that she probably would not have prescribed the device. So a jury is a very deferential standard of review, so why are we to overturn the jury's verdict? Your Honor, if I may say precisely what the question was to Dr. Burkett, because that's critical here, and I think that's the issue we have to decide here. She was asked the question if she knew that the TBTO was contraindicated, contraindicated, should not be used in women with an active lifestyle, would she have prescribed it? And she said no. Obviously she's going to say no, because if it's contraindicated, you're not going to prescribe it. There is no evidence in the record, competent expert evidence to a reasonable degree of medical certainty, that the TBTO should be contraindicated in active women. The only testimony on that topic is from Dr. Blavis, who testified that there's some evidence that in people who are active, because of the propensity for causing chronic groin or thigh pain, you might want to think of another operation. That's a far cry from a testimony from a doctor saying to a reasonable degree of medical certainty, based on the information that he's reviewed, that it should never be implanted, should be contraindicated in women with an active lifestyle. The judge let that go to the jury. We think that's, the law is pretty clear, it's an insufficient predicate. Illinois law requires these contraindications, these warnings to be to a reasonable degree of medical certainty. That's not here. We don't have the kind of predicate to sustain that. There's a second reason why that argument fails, Your Honor. Not only the lack of competent testimony, it's because the complications that arise from this implantation in active women is thigh and groin pain. And Ms. Husky did not have chronic thigh and groin pain. The only testimony on that issue is from Dr. Pramuji, who reviewed her medical records and spoke about her complaints, and she did not have a complaint of chronic thigh and groin pain. What about, hold on, what about the physical therapist who described Ms. Husky's complaints of right sacroiliac? Yeah, whatever, down her leg. And that was a problem for the plaintiffs. They never had a doctor to link it up. They have a physical therapist, not a doctor, who's talking about the complaints that she had. The sacroiliac joint pain happened 10 years before the accident, before the implantation. And in an opening statement, Plaintiff's counsel said, that's not related to this. The sacroiliac pain is something that occurred before. And during cross-examination of Dr. Pramuji, in the brief, says, we agree that that's not her main complaint, that chronic thigh and groin pain is not her main complaint. And so not only do you have a failure I'm sorry, but see, this is all sounding like a jury argument. And that's, I think that's what Judge Diaz was getting at. You start by saying this specific doctor said something that absolutely is fatal to Plaintiff's case. And now we're talking about other witnesses and direct examination and cross-examination. So can you bring it back to... Absolutely, Your Honor. Dr. Burkett knew of all the risks associated with this product and testified that she would use it again. The only issue that's outstanding is this alleged contraindication. But there is no evidence in the record by an expert witness testifying to a reasonable degree of medical certainty that the TVTO is contraindicated in patients like Ms. Husky. So that's a failure of proof. This is not a magic words case. No, it's not. The doctor doesn't have to use contraindicated to say, as I understand it, she did. No, if I'd been warned about this, you know, I'm not so sure I would have done this. That may not be a contraindication. I think I knew it was the exact testimony. I'm sorry, Your Honor. If I'd been warned about this, that it was contraindicated, that it shouldn't be implanted in women who are active or actively exercising FIT women, I don't think I would have prescribed it. But, Your Honor, contraindication is a term of art. We've cited the cases to the court where contraindication, it means it's never to be used. Dr. Blavis doesn't say that. There's some evidence in people who are active, you might want to think of another operation. Not that it's contraindicated. And there's no evidence, no literature to support it. There's a document. So would your argument be the same if she had used the term, in my view, this would have made it contraindicated? Would your argument be exactly the same? If there was an expert witness who testified. No, I'm talking about this witness. This witness. The one you focused on. Dr. Burkitt did not know it was contraindicated. That's the whole point, Your Honor. And there is no, it's a false hypothesis because there's no evidence that it is contraindicated. Does it have to be a contraindication or simply some concern about its use in particularly active women? It has to be a contraindication. The problem is that Dr. Burkitt was not asked the question that Dr. Blavis testified about. Dr. Burkitt was not asked the question, well, if there's some evidence that in people who are active because of propensity for causing chronic groin or thigh pain, you might want to think of another operation. She wasn't asked that question. And if she had been asked that question, it may have a bearing on what's going on here. I find it very odd to have a lawyer in an appeal complain about some witness wasn't asked the particular question. Well, Your Honor. I mean, that drips with irony, doesn't it? Who gets to ask questions at trial? But there's a burden of proof. The plaintiff's burden of proof is to establish a contraindication to a reasonable degree of medical certainty. You just told me that if they had asked the question differently, perhaps the result would be different. It's not, is it required that there be a contraindication or simply some concern about the product's use in particularly active women? Based on Dr. Burkitt's testimony that she would use this TVTO tomorrow, because it's the best she had, and the only time that she would question it is if it was contraindicated, you have to have the predicate question of something less, like Dr. Blavis testified to, to see if that would impact her decision. She also testified she'd never had a problem implanting these in active women. She'd never heard of that before. This was new to her. And the point of the matter is, it's not in the literature, it's not out there, it's not in the FDA evidence that looked at all of these slings that the jury was prevented from hearing. What about the, you said it's not in the literature, I guess you don't classify your client's internal documents suggesting that there was some connection of pain in particularly active women? Your Honor, that's an internal document by my client recounting a conversation with the inventor of the product, expressing a concern about this possible risk. It's a far cry from a contraindication. A contraindication, again, is a term of art. The case has discussed what a contraindication is, but there's nothing in that document that should cause any, that hasn't been tested, hasn't had any Dalbert analysis to it, an expert witness hasn't adopted it and said, based on this, there's a contraindication. It's a totally different level of evidence and not enough to satisfy the plaintiff's burden of proof on this very important issue. It's a failure of proof. It's not our responsibility to ask the question. It's the plaintiff's responsibility to establish the predicate for the failure to warn the claim in the face of her testimony that she'd use it again tomorrow because it's the best that she has for this patient. Your Honor, we're running out of time. I'm going to jump to the FDA issue. I just want to be sure that I understand that you must prevail on both of these. There was a general verdict here, correct? You must prevail on both of the claims. Yes, Your Honor. You must get them both reversed. Yes, Your Honor. And I want to go to the FDA evidence because it bears on both, if I'm running out of time, on both the failure to warn claim and the defect claim. The FDA, in 2011, commissioned a panel to look at these midurethral slings. And the FDA convened their advisory panel and came out with an extensive document that the Ethicon proposed to be submitted to trial. The court excluded this. The significance of this is that the FDA found that these midurethral slings were safe and effective. This is an independent government agency charged with the responsibility for regulating those devices that may be implanted in women, including this device. This is not a CISN issue. This is not a CISN issue where the court found that the 510K did not go to safety. These documents went specifically to safety and are certainly relevant. They go to failure to warn because the FDA looked at all of the risks associated with the product and found in their review that the risks are well established and well known. The only difference between pelvic floor surgery and mesh surgery is the risk of erosion, which is something that are warned of. And the FDA did this in 2011 and also in 2013, and the court refused to allow that information to be considered by the jury. The jury wants to know what FDA does. The jury is knowledgeable about these processes and understands that FDA plays a role in this. And there's no mini-trial here to worry about like was talked about in CISN. This is the FDA's position. Lawyers deal with this all the time. And if the court were to uphold the exclusion of this evidence as well as the other regulatory information that we talked about going back to the 60s when proline mesh was first approved, proline suture was first approved by the MS... Before you run out of time, let me ask you this. These are the exhibits, as I recall, that your opponents say were not expressly ruled upon by the court and so that it was your obligation to seek a ruling. And so, effectively, there really isn't anything for this court to consider. What do you say to that? I'd say that we've dealt with this issue in the Lewis case that this court heard before when I was up here on the review. We litigated the issue then. We litigated it again in Husky. We filed a response to plaintiff's motion in limine and attached all the documents that we're talking about here today in response to that motion in limine. And in response to that, the court excluded all of that. The court granted summary judgment to plaintiffs on all of our affirmative defenses dealing with regulatory issues. Excuse me. You're talking so fast, it's hard to break in. I'm sorry. No, I know what you're doing. So what I guess is usually in motions in limine, the district court can deny their admission but say that it will review it at trial. That didn't happen here? It didn't happen, Your Honor. As a matter of fact, it was very clear that no mention of the FDA was to come in. I had some exhibits during the course of the trial where the court admonished me because I inadvertently had an FDA initials in a document and he told me to take it out immediately. Another document, he asked me if FDA was anywhere in the document. I said, I don't know. He said, you better figure that out or else I'm going to sanction you if FDA is anywhere in that document. The parties knew that FDA, anything about FDA was out of bounds. In post-trial motions, we argued this. Plaintiffs never argued that we waived our right by failing to make an offer of proof at that point. It was very well known. And the best evidence of that, I think, Your Honor, is cited on page 26 of our brief where we sought to introduce the AUGS position statement, the American Urogyneological Society position statement that discussed the FDA positions. The original is on page SA, supplemental appendix 5154. The redacted version is what was admitted at trial. Mr. Thomas, you're going into your rebuttal time. You can do that, but I just wanted to alert you to that. I will say that, Your Honor, I do want to say that the court also refused to apply comment K to the case at issue here. Illinois law clearly follows comment K, and we believe it's error for the court to basically abrogate comment K and apply the risk utility analysis for the jury. And I will save the rest for rebuttal. Thank you. Thank you very much. Mr. Wallace? Good morning. I'm Ed Wallace, and my colleague Fidelma Fitzpatrick and I are going to split the argument. I've been allotted 10 minutes. What I'm going to do is address the issues in largely reverse order. Ms. Fitzpatrick is going to address the warnings issue. So I'd like to start off with the FDA evidence argument that Mr. Thomas made, and I want to address something that you said. What Mr. Thomas did was an excellent argument that he should have made in front of Judge Goodwin on a Rule 103B offer of proof with respect to this FDA evidence. And I want to be very specific about that because I believe that ends the appeal. And what I mean by that is this. In black and white at the joint appendix at 1651 and 1652, Judge Goodwin said, and as this court very much probably knows, because as he likes to say, he's been around the block a few times, he is very limited in his motion and lemonade rulings. He likes to address things as they come up in trial. And that is absolutely, I found out the hard way, that's what Judge Goodwin likes to do. And he's had hundreds of motions and lemonade that have been filed in front of him, and what is frankly the biggest indeal ever. And what he did is he said, the 510K evidence is inadmissible in this case. He did not address documents that they chose to attach to their opposition brief. He did not address those directly. Those documents, and to go to this inadvertent issue that Mr. Thomas raised, because I do remember the exchange, what they could have done as a practical matter at that point is they could have taken the FDA evidence that they now suddenly want to have on appeal. They should have gone to Judge Goodwin, who is like any good trial judge, entitled to weigh the evidence in front of him, because he'd seen the jurors' reactions. He'd made his own judgments on how the evidence had come in. And they never afforded him that opportunity. There's six volumes that we've filled of binders and have looked everywhere. They had the opportunity to do that, they didn't do it, and under 103B, and as our brief points out, the appeals should end there. And that's true even in the face of this sort of general admonition that the initials FDA were not to be talked about? And if you read the exchange, Judge Diaz, what you'll see is Mr. Thomas is absolutely right. He made a mistake, because what happened is, like any good trial judge, Judge Goodwin did not want things going up without him knowing what was in it. And they inadvertently put up an article that had the FDA mentioned in it, without making an offer of proof, without going to the judge and saying, listen, we have some FDA evidence that we now want to put in. They had every opportunity to do so. We had lots of sidebars at trial. They had every opportunity to do so. But, of course, if the district judge had denied them the right to put this evidence in, you don't have to keep making an offer of proof about it. I mean, you don't have to keep reassessing it. Indeed, most trial lawyers are reluctant to keep doing that. That is correct, Your Honor. So tell me about this first, in the very beginning of the trial, when they was ruling on the motion in Limine? I believe his exact words were that the 510K evidence is admissible, inadmissible in this case. And he always makes a statement at the beginning of his motion in Limine rulings that they are limited in scope. So he didn't address documents that they chose to attach in an opposition brief. And to address those documents briefly in the time that I have allotted, I'd like to speak to the merits of those documents, because there's also some practical issues with that as well. And Judge Diaz may remember this from the Sisson argument. Somebody on the panel at the Sisson argument, where there was FDA evidence that the defendants wanted in, in that case, one of the judges asked, well, wait a second, and I'm going to paraphrase because I don't remember the words exactly. They said, if you had underlying scientific evidence that you submitted to the FDA, couldn't you put that in too? And I don't know whether or not Judge Diaz asked that question or someone else did. And that's exactly what Ethicon did here. Last night, we went and counted the number of what they like to call first line, best evidence, peer reviewed journal articles, and society statements. Ethicon chose to submit 23 of those. 23 times. Probably in Judge Goodwin's opinion, 22 times too many. But he let 23 be published to the jury that said the exact same thing that this FDA statement did, which is all the FDA did is they assessed the literature and they said there is literature out there that says that midurethral slings generally, not the TVTO, have shown some evidence that there's safety and efficacy for up to one year. They didn't address the TVTO by name. They did that numerous times with their articles. 23 times. And in turn, we put up 36 articles, including more recent literature. The jury and the judge assessed all of that. So in other words, what I'm saying is Judge Goodwin, who was afforded under an abusive If you don't think they were entitled, the FDA has a special, special role, right? A special star. Well, they certainly, and their argument You would call that prejudice. They would call it particular relevance, right? Well, and precisely the argument that Mr. Thomas made shows why we'd have a trial within a trial. Because in my humble opinion, I believe it overstates what the panel did. They assessed what literature was out there. They, I believe he said, and essentially it seems to me they wanted Would you oppose the FDA? We absolutely did. Well, why did you oppose it if it didn't do anything? Because as Judge Goodwin pointed out in his Rule 50 ruling, it has the potential to confuse the jury. The idea that the evidence, we did not want to have a case where we're arguing over what the FDA did was right or wrong or whether it was even relevant. I know, and Ethicon knows, that the FDA, when all it was doing was assessing some of the literature that was out there, albeit a very limited set of literature, didn't have the Ming Chin evidence where their own safety specialist was saying These warnings need to be updated. These complications are not transitory at all. Even though the warning said that. They didn't have the degradation documents. The FDA, and by the way, we all know that I never would have been able to haul an FDA witness into trial. So that would have been prejudicial to the plaintiffs. So when you're looking at this in an abusive discretion standard, and the idea that they have to not only show error on evidentiary issues, but substantial error, and Judge Goodwin pointed it out at the Joint Appendix 4582. Again, as you pointed out, there has to be some deference to a judge that has dealt with these cases for the better part of a decade. And real briefly, I see less than three minutes at this point. I do want to address Comet K because Mr. Thomas also raised it. The appellants point out in their brief that the judge refused to apply Comet K. And if you read the record again, you'll see that there was an exchange between my colleague sitting right over there, Mr. Miller, and Judge Goodwin. And Judge Goodwin pointed out to Mr. Miller that Mr. Miller was absolutely correct. Here's what Judge Goodwin said about his review of the record and how he assessed the evidence. He said, there's no evidence that I'm aware of. I didn't hear any. That's at the Joint Appendix 3398. So again, Judge Goodwin received the evidence. He's tried a lot of cases as a trial judge. He's been a trial lawyer. And he has earned the standard of review, just like the evidentiary issues. Here, I would submit the burdens even higher when you're talking about jury charges. Because he sat and heard the evidence. They have to show, and it's their burden, by the way, with respect to Comet K, that the failure to give a charge which is not in the Illinois Pattern Jury Instructions at all would have seriously impaired Ethicon's case. They've made no such showing here. And the one case that they do cite is very much parallel to what Judge Goodwin did. In the Glassman case, which Judge Goodwin addressed in his Rule 50 motion, and which they rely on, it's a 1992 First District decision from the Illinois Appellate Court. The court there said the defendants had not met their burden to obtain summary judgment and didn't present enough evidence. That's exactly what Judge Goodwin said. So he didn't refuse to apply Comet K. Instead, he saw that the right jury charge was the Risk Utility Test, that is an Illinois Pattern Jury Instruction. He charged the jury, by the way, and we see that at footnote 12, where he explains where he charged the jury with looking at the risk and benefits of the product. He simply decided in the face of his substantial discretion not to give a charge where there had been, for example, a battle of the literature. There had been discussions both for and against these issues. When we talk about alternative designs, by the way, we show differences even within the same product, that the inventor of the first-generation TVT would not even, who was a consultant to Ethicon, would not even use the device that was implanted in our client. And the jury was entitled to weigh that. The judge was entitled to weigh that with respect to Comet K. And what they're really asking for when it gets down to it is whether or not they get complete immunity. And I would submit that in the face of this evidence, substantial evidence, and with the appropriate deference to this trial judge, that we should not be inventing the policy here where there's been absolutely no Illinois court that's ever done so. And I appreciate your time. Thank you very much. Mr. Fitzpatrick? I'm sorry. Ms. Fitzpatrick. Good morning, Your Honors. There are two of us in the courtroom today. Lost in the sea of dark suits. Good morning, Your Honors. Thelma Fitzpatrick on behalf of the plaintiff. And as Mr. Wallace indicated, I'm going to address the issues concerning the learned intermediary. And there are two particular issues that I want to address. The first is that Ethicon's argument is laid out in its brief and is laid out this morning is a misstatement of the law of Illinois. It's applying legal principles that have been expressly rejected by Illinois courts and are not tenable. The second issue that I'd like to address is that it also disregards the factual record in this case. It presumes that if there is a conflict in testimony or issues of credibility that must be weighed, that that de facto means that the defendants have to win. And, of course, that's not the standard at the trial. As Your Honor noted earlier, all of the factual arguments that Ethicon makes in its papers made today are the very same arguments that were made to the jury and rejected by the jury. Well, but Mr. Thomas also makes a legal argument that you were required to present expert testimony to a degree of medical reasonable certainty that there was, in fact, that this product was, in fact, contraindicated for women who had an active lifestyle. Two questions. One, were you required to do that? And two, if you were, where's the evidence of that? The short answer is, no, we were not required to do that. And the short answer to the second question is, even though we were not required to do it, the evidence is ample anyhow. The reason that we were not required to do it is under Illinois law. The Learned Intermediary Doctrine only applies if the warnings that were given by the manufacturer are adequate. We have pointed out to the jury and in the evidence that we have put in front of your honors that the warnings that were given by Ethicon in this case were not adequate, not only on the contraindication for active women, but also to the extent that Ethicon did not warn of things like chronic pain, mesh degradation, chronic inflammation, chronic foreign body response, and a whole host of other issues that Mrs. Husky suffered from. Those were missing from the instructions for use. They were not warned about by Ethicon, and they were material to this case. So under Illinois law, which – The failure to warn on things that don't go to this active women business, I don't know how that particularly aids you with respect to – If there's a failure to warn with respect to the active woman thing and that was established, okay. But if there was a failure to warn on those other items and we're now going to the active woman issue, I'm not sure how I follow that. Your Honor, the reason for it is this. Under black-letter Illinois law, plaintiffs are not required to make any showing that a physician would have taken alternate action had they been warned. Okay. Taking solely the issue of the active woman, what we have shown is that Ethicon's internal physician who developed this product knew that women who were active suffered from increased pain. That was an issue that was internally discussed by Ethicon. That was an issue that was internally known by Ethicon, and that was an issue that it is undisputed Ethicon did not warn either Dr. Burkett, who said she didn't know about it, or others in the medical community. We had then two urogynecologists who came in as experts who testified, Dr. Rosenzweig and Dr. Blavis, that it is true that the TVTO, which is a particular device that's implanted in a particular way, presents specific problems for active women like Mrs. Husky, women who run, women who elliptical, women whose job is, in her case. So there was expert testimony that substantiated what Ethicon knew internally, that this product should not be used in active women. But the question that was asked of the doctor was whether or not, if she had known that the product was contraindicated, which Mr. Thomas says is a term of art that says under no circumstances should that product be prescribed for particularly active women. What you've just described are concerns about the product's use with respect to active women, but not evidence of a contraindication, or is this just a matter of semantics? It's a complete red herring and a complete matter of semantics. Contraindication or warning, what it indicates is that there is information that is conveyed from the manufacturer to the physician that there are potentially adverse events in a class of women who may use this device. The distinction that Ethicon tries to go with with this contraindication versus warning is of no moment. A contraindication and a warning are both issues that appear in the IFU. They're both something that is required from the physician to tell, excuse me, from the manufacturer to tell physicians about particular problems. And in here we have absolutely unequivocal testimony on that particular issue, the active woman indication, that had Dr. Burke had been told what Ethicon knew, she would not have put it into this specific patient. I guess the argument is maybe she would have, maybe she wouldn't have, but she didn't have affirmative indication that it was contraindicated, and therefore, I'm trying to make sense of this, the evidence is in equipose. Is that what it amounts to? And therefore, you lose as plaintiff because, yeah, we didn't tell the learned intermediary everything that we could have, but the nature of what we didn't tell the learned intermediary is such that the learned intermediary really wouldn't have been able to do anything with it in the first place. The legal fallacy of Ethicon's argument to that effect is the assumption that under Illinois law, that the plaintiff has the burden of proving that the physician would have changed their conduct. And under the Noyola case, it is black-letter law that, quote, what a physician might or might not have done had she been adequately warned is not an element plaintiff must prove as part of her case. That is black-letter law. What Illinois law says very specifically is that that proximate cause is a question of fact for the jury that can be inferred from all of the circumstances. Totality of the circumstances. And we know that from the Noyola case that even when a physician testifies, I would still have put this in no matter what. The Noyola case stands for the explicit proposition that that's only one piece of evidence that the jury should consider, and that the jury is entitled to disregard that on credibility factors or on other factors given the totality of the evidence that they have heard. What are the others, by the way, if you can mention? Obviously, if the jury doesn't believe the doctor, that's one thing, but what else is out there? Well, there's the reasonable presumption that a jury can make that a physician having received an adequate warning would have heeded that warning and would have acted in a way that they conveyed it to Mrs. Husky in this case. The jury is entitled to look at the what I think somebody called the ambiguity in Dr. Birkett's testimony when she says on one hand she would not have used it specifically in Mrs. Husky. That was her testimony versus testimony she gave in response to Ethicon questioning, which is she probably would maybe have used this device in people like Mrs. Husky, but not Mrs. Husky specifically. The jury can weigh that. Of course, that's a 2020 judgment, right? The jury was entitled to consider that. That's exactly right. The jury gets to weigh that testimony in conjunction with the other treating physicians like Dr. Siddique, like Gretchen Dean, the physical therapist, gets to weigh it in light of the testimony from the urogynecologist. But NOYOLA stands for that very exact proposition, that being able to pull a single sentence out of a deposition that is taken out of context is not sufficient to establish what it is that Ethicon here is trying to establish. And that issue of proximate cause in Illinois law is something that is very clearly left to the jury. The jury heard all of these factual arguments before. The jury heard why Ethicon doesn't believe that its failure to warn was a proximate cause, but it also heard the plaintiff's side of why we did believe under these facts that it did, and it rejected what Ethicon's arguments are. And they're coming here before an appellate court saying, substitute your judgment on credibility and all of these factors, not only for the jury, but also for the district court who presided. And that's not allowable under Illinois law, and that's not allowable under the facts of this particular case. Is this the first case under Illinois law that Judge Goodwin is disposed of? Yes, this is the first Illinois law case, and it's the first one against Ethicon. No summary judgments, no trials so far? This was the first trial. There may be subsequent to this some summary judgment motions that have been decided in other cases. I'm not aware of those. But very quick. I wanted to quickly address the issue of why these warnings that weren't there beyond the act of woman. Under Illinois law, because plaintiffs do not have to prove what a physician would or would not have done, we're faced with a record here where there's no evidence. We know that the warning was inadequate. We know that Ethicon didn't include certain known risks in its devices. We know from their internal testimony that they were supposed to do that. And we also know that Mrs. Husky suffered those exact type of injuries, the chronic inflammation, the reasons that she had to have, the chronic infection that she had to have this removed. And under Illinois law, the jury is allowed to make, based on all of the circumstances, the informed judgment that this physician, had she been told about chronic inflammation, chronic infection, chronic problems, pelvic problems, she would have been able to or she may have differently warned or differently consented this patient. That is specifically allowed under Illinois law. And Ethicon does not want to talk about those particular warnings, but they're particularly important to these cases, this case, because they are the specific conditions from which Mrs. Husky suffered. And that's why that is particularly important. Thank you. Thank you, Your Honor. I'd like to address the Noyola case first, a case relied upon by the plaintiffs for the duty. The Noyola case, it's an unpublished decision from the Eastern District of Illinois, relying on Texas law, making a guess of what Illinois would find to be the burden of proof to the plaintiff. It relies on the Marr case, which was decided under Texas law. And since that time, as this Court's aware from the Lewis case, Texas has changed its rule. You do need to prove that the different warning would have changed the conduct of the physician. And the same things happened in Illinois, Your Honors. We have cited to the Court three cases, two in the state court and one in the federal court, following Noyola, the Broussard case, the Blau, B-L-A-U-E case, and the Moore case, M-O-H-R, where the Court finds as a matter of law that you have to show that the warning would have made a difference, that somebody would have changed their conduct based on the warning. And that only makes sense because if you don't have evidence of proximate cause, that is that a specific warning would have changed the decision of the prescriber to make this prescription to the person under the learned intermediary doctrine, you're allowing the jury to speculate, you're allowing the jury to guess, and you're allowing the jury to do something that it wouldn't do if they asked the right question to the doctor. And we don't have that here. As to the FDA evidence, Your Honors, I'd suggest to the Court that if you affirm the decision of district court to exclude all these FDA documents, that Husky v. Ethicon will be cited in cases around the country for the proposition that FDA evidence is never relevant in a medical device case. Well, I guess it depends on the nature of our ruling. Your opponent says that these matters simply weren't properly presented to the district court judge. I've looked at his order. I mean, the order on its face is just talking about the 510K evidence, not about anything else. If you read the order, it says the 510K evidence and other failure to enforce documents. Where is that? I'll have that for you here shortly. Let's see if I can put my hand right to it. We submitted, in response to our motion in limine, all of these documents. And in the post-trial motions and throughout the case, the Court notes that they've ruled on this issue countless times. The Sisson case came before ours. All the other cases came before ours, and we've lived with rulings in other cases. Joint Appendix 4582. Ethicon argues this Court's exclusion of TBTO's clearance under the FDA's 510K process, along with other FDA-related evidence. That's on page 28 of the order. Is that the motion in limine order? I'm sorry, where are you in the Joint Appendix? 4582. What are you reading from? It's the post-trial order. I'm talking about the pretrial order, the motion in limine order, where he's expressly limiting his ruling to FDA 510K evidence. He says nothing about any other evidence before the Court. That's a Joint Appendix 1651. He does not specifically deal with all the documents that we did present, but he talks about, he's identified all of the documents associated with the 510K process. The briefing of it included all of these documents that we're talking about. Clearly, he refers to the 510K evidence, and if you refer to the 510K evidence collectively as a part of what was submitted in connection with that motion, that includes all of the regulatory history. The way we argued the motion was that the 510K evidence included all of the regulatory history of proline sutures, all the way up to the TBTO, which is a 50-year history. And the fact, you're correct, he does not specifically address the individual documents that we argued. It was fully briefed by both parties. And it was very clear from the Court's ruling to us and the way that the Court handled us during trial that FDA was not to be a part of this case. And that was based on Sisson, based on Lewis, that had also been tried. And we loaded our guns and fired all we had in connection with this motion in limine, and the judge says, no, it's not coming in. And we understood, and the parties tried the case. I was admonished myself twice during the trial not to try the case. And if it's the Court's ruling, again, as Judge Mott stated, believe me, after hearing the judge look at me, I was worried about contempt. He threatened me with sanctions if I did something wrong. And the law is clear that once it's clear to you and clear to the parties that you're not going to litigate these issues any further and that you relied on a pre-trial, an order of pre-trial. And it's not in the District Court's order there, right? That's correct, Your Honor. So what is it that you're relying on? The fact that we briefed all of the issues and he excluded all the evidence that we submitted in connection with the 510K regulatory process in the order that the Court just, the 510K evidence, which included all of the documents that we attached to our motions, which is a very voluminous record of information. What is the exact language that the Court, because for some reason I don't have it. On Joint Offendance 1651, before the Court is a motion limiting number one to exclude 510K evidence, 510K evidence, for the reasons stated below the motion is granted. The 510K evidence, the way we briefed it and argued it, was all of the regulatory history going back to the 1960s when the proline suture was approved, not cleared, approved by the FDA. A lot turns on the meaning of it, doesn't it? Well, Your Honor, in post-trial motions, that we didn't preserve that issue. I think that if we had failed to perfect the record appropriately at that time, that perhaps a motion would have been made by plaintiffs at that time. Everybody knew what the rules were. And believe me, I knew what the rules were because I was threatened. Except the three of us weren't there. No, Your Honor. This is all we've got. But if an offer of proof was supposed to be made, they should have made it in a post-trial motion so Judge Goodwin could say, wait a minute, everybody knew this. The judge was there. The judge made the ruling. The judge could have handled that in his post-trial motions. In fact, he did talk about the fact that other evidence was excluded. But you're right. There's no itemization of these specific documents. And it's hugely prejudicial because it goes to both the failure to warn claims and the design claims. The FDA convenes this panel to make these judgments about this product. And the plaintiffs claimed we could have used all the underlying evidence. They claimed it was bought and paid for. They claimed it was biased. Our consultants did all the work. Our consultants are the ones who members of this organization that we paid. And so these societies, these groups that endorsed this product were bought and paid for by us. The FDA is the only independent regulatory issue agency who can speak to this and say, you know what, it's not just these agencies. The FDA says the same thing everybody else does. And it goes to both the design claims and the warning claims. I see I'm way out of time. I gave you a little extra time. Thank you, Your Honor. I appreciate it.
judges: Diana Gribbon Motz, Albert Diaz, Andre M. Davis